UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ALLIANCE SECURITY PRODUCTS, INC., et al.,

                Plaintiffs,

      -against-                                        05 Civ. 5214 (LAK)

FLEMING COMPANY,

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION**

      Appearances:

           Frank H. Penski
           Erika J. Duthiers
           Tamar Duvdevani
           NIXON PEABODY, LLP
           *Attorneys for Plaintiffs*

           Keith A. Rabenberg
           SENNIGER POWERS

           George F. C. Love, Esq.

           *Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

      Plaintiffs Alliance Security Products, Inc. ("ASP") and Alliance Security International, LLC ("ASI") allege that defendant Fleming and Company, Pharmaceuticals ("Fleming"), misappropriated their idea to manufacture and market a potassium iodide liquid solution to prevent thyroid cancer in children exposed to radiation. Plaintiffs seek to enjoin Fleming from selling a product called ThyroShield, which they claim is their product marketed according to

2

their unique business plan. Fleming moves for summary judgment dismissing the complaint. Plaintiffs move for a preliminary injunction.

*Facts*

I.     Rule 56.1 Statements

A preliminary matter must be addressed before getting to the pertinent facts.

On a motion for summary judgment, the moving party bears the burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. In considering such a motion, all facts and inferences reasonably drawn therefrom are construed in favor of the nonmoving party.[1]

In addition, Local Civil Rule 56.1 of this Court provides that a party moving for summary judgment must file a concise statement of material facts it claims are undisputed, with each statement of fact followed by a citation to admissible evidence. Each statement then is deemed undisputed for purposes of the summary judgment motion unless the nonmovant specifically denies it, citing to competent evidence.[2]

Plaintiffs have failed properly to put many of defendant's statements of fact into dispute. First, they respond to several of defendant's statements without references to admissible

---

[1] *E.g.*, *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999).

[2] S.D.N.Y. Civ. R. 56.1.

evidence.[3] Statements responded to in this way are deemed undisputed for purposes of this motion.[4]

Second, plaintiffs respond to a number of defendant's statements by stating that they "lack[] knowledge or information sufficient to form a belief as to whether" the statements are true.[5] Such responses are insufficient to put a statement of fact into dispute. Statements responded to in this way are deemed undisputed as well.[6]

Finally, plaintiffs respond to many of defendant's statements by making legal arguments. For example, in paragraph 14, plaintiffs concede that it has been common knowledge for decades that ingesting potassium iodide is a safe way of aiding the prevention of thyroid cancer, but go on to "dispute[] any implication that this fact renders Alliance's confidential information and novel idea 'common knowledge.'"[7] Such legal arguments, which are plentiful in plaintiff's counter-statement, belong in briefs, not Rule 56.1 statements, and so are disregarded in determining whether there are genuine issues of material fact.[8]

---

[3] *See, e.g.*, Pl. Rule 56.1 St. ¶ 112.

[4] *See Archie Comic Publ'ns, Inc. v. DeCarlo*, 258 F. Supp. 2d 315, 317-19 (S.D.N.Y. 2003), *aff'd*, 88 Fed. Appx. 468 (2d Cir. March 3, 2004), *cert. denied*, 543 U.S. 813 (2004).

[5] *E.g.*, Pl. Rule 56.1 St. ¶¶ 3, 27, 40.

[6] *See Archie Comic Publ'ns*, 258 F. Supp. 2d at 317-19.

[7] Pl. Rule 56.1 St. ¶ 14.

[8] *See Archie Comic Publ'ns*, 258 F. Supp. 2d at 318 & n.9 (counter-statement including legal conclusions without material facts to support them is insufficient to put facts into dispute); *see also Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 509 n.12 (S.D.N.Y. 2003) (no heed given to legal conclusions in Rule 56.1 statement).

4

## II.    Undisputed Facts

In light of the foregoing, the following facts are undisputed for purposes of this motion unless otherwise noted.

### A.    Potassium Iodide

It has been well known, at least since the late 1970s, that ingesting potassium idodide ("KI") is a safe and effective way to block the uptake of radioactive iodine by the thryroid gland. It therefore aids in preventing the development of thyroid cancer in those exposed to radiation.[9]

#### 1.    PIMA

Defendant develops, manufactures, and sells ethical pharmaceutical and over-the-counter products.[10] Beginning in 1968, it manufactured a raspberry flavored syrup called PIMA,[11] which originally was marketed as a cough expectorant,[12] but was known to have additional valuable properties because it contained KI.[13]

In 1986, Fleming supplied PIMA to the victims of the Chernobyl disaster to be used

---

[9] Def. Rule 56.1 St. ¶ 14 & Exs. 10 (Foltin Dep. 81-84), 13 (FDA guidance document) (recounting previous FDA findings dating from 1978 about KI and thryoid cancer prevention).

[10] Def. Rule 56.1 St. ¶ 1.

[11] *Id.* ¶¶ 1, 12.

[12] *Id.* ¶ 12 (citing Cpt. ¶ 3); Baker Decl. ¶¶ 5, 42; Duthiers Decl. Ex. A (Johnson Dep. 132).

[13] Def. Rule 56.1 St. ¶¶ 12, 14.

5

as a thyroid protectant.[14] In 1998, Fleming contacted the Nuclear Regulatory Commission ("NRC"), which had recommended creating national stockpiles of KI to improve government preparedness for nuclear disasters,[15] and asked to be considered as a provider of KI for these stockpiles.[16] At least as early as 1999, Fleming included in its PIMA product insert a paragraph indicating that the syrup could be used as a radiation protectant for the thyroid gland.[17]

   *2.   Public Awareness*

Federal agencies have been advocating the stockpiling of KI products near nuclear

---

[14] Plaintiffs appear to dispute the fact that Fleming supplied PIMA to Chernobyl victims in their Rule 56.1 statement. Pl. Rule 56.1 St. ¶ 16. However, plaintiffs conceded the fact in their pleadings, Cpt. ¶ 77 n.2 ("Fleming delivered some PIMA syrup to address the radiation concerns of someone in the Eastern European bloc after the Chernobyl nuclear accident in 1986."), and the co-owner and chief executive officer of ASI and ASP, Steven Baker, referenced this fact in a slide show presentation he gave to Fleming in 2003. *See* Def. Rule 56.1 St. Ex. 15 (slide show).

Plaintiffs claim also that Fleming has failed to point to competent evidence to support this fact. Pl. Rule 56.1 St. ¶ 16. However, Ted Feller, a long time Fleming employee, stated in his affidavit that Fleming supplied thousands of bottles of PIMA to Chernobyl victims in 1986 and that he "was directly involved in facilitating the shipment of PIMA in response to the Chernobyl disaster." Def. Rule 56.1 St. Ex. 7 (Feller Decl. ¶ 4).

Finally, plaintiffs point to the fact that the evidence conflicts as to exactly how many bottles of PIMA Fleming supplied to the Chernobyl victims, *see id.* Exs. 12 (letter from Fleming to FDA, dated Oct. 24, 2003) (5,000 pints), 14 (letter from Fleming to Nuclear Regulatory Commission) (20,000 bottles), 16 ("Cracker Barrel Sessions" letter) (10,000 pints), and fails to establish that PIMA ever was used by Chernobyl victims. This misses the point. The relevant fact is that Fleming supplied *some* PIMA to Chernobyl victims because it knew of the beneficial effects of KI, regardless of how much it sent or whether it ever was used.

[15] Def. Rule 56.1 St. ¶ 22 & Ex. 21 (NRC draft report, dated July 1998).

[16] *Id.* ¶ 24 & Ex. 14 (letter to NRC chairman, dated Sept. 2, 1998).

[17] Def. Rule 56.1 St. ¶ 26 (citing Cpt. ¶ 77 n.2) & Ex. 24 (product insert).

6

power plants since the 1980s.[18] Public awareness of the potential need for KI grew after the September 11, 2001 terrorist attack. Numerous politicians and news commentators began discussing the possibility of terrorist attacks on U.S. nuclear facilities and the need to be prepared for the medical emergencies that could follow. Several commentators mentioned specifically the need to stockpile KI.[19]

In late 2001, presumably in response to this heightened awareness, the FDA published a guidance document in which it outlined procedures for administering KI to children in the event of a radiation emergency. The document listed safe dose sizes for children of various ages and recommended dissolving solid tablets in liquid to ease ingestion, especially when administering KI to babies.[20]

### 3. *Fleming Contacts the NRC*

In early 2002, Fleming offered again to provide the NRC with PIMA for government

---

[18] Def. Rule 56.1 St. Ex. 56 (Federal Emergency Management Agency notice, dated July 24, 1985); *Id.* ¶ 22 & Ex. 21 (NRC draft report, dated July 1998).

[19] *E.g.*, Def. Rule 56.1 St. ¶¶ 41, 42, 44, 47, 48-49, 56-57 & Exs. 33 (*Boston Globe* article recommending KI pill stockpiles), 34 (CNN article discussing NRC's concern about attacks on nuclear plants), 36 (*Seattle Post-Intelligencer* article discussing the Department of Health and Human Services' decisions to buy millions of doses of KI for radiation emergencies), 39 (Senate testimony of Dr. Irwin Redlener, president of Children's Health Fund, regarding the threat of terrorist attacks on nuclear facilities and the need to stockpile KI), 43 (American Thyroid Association 2002 recommendation for stockpiling KI at facilities "such as schools, hospitals, clinics, post offices, and police and fire stations"), 51 (*Newsday* article advocating stockpiling KI in households, schools, and daycare centers).

[20] *Id.* ¶¶ 35-38 & Ex. 13 (FDA guidance document, dated Dec. 2001).


7

stockpiles of KI.[21] It was told, however, that the NRC had awarded a two-year contract for KI pills to a company called Anbex, in part because the NRC's "bid specs required that the manufacturer have FDA approval for their drug product,"[22] which Fleming lacked for PIMA. At that time, PIMA was available only by prescription and was not FDA-approved for use as a radiation protectant. Nor had it been sold with pediatric droppers or child-safe caps.[23]

      B.     *The Parties Meet*

Plaintiffs sell safety and antiterrorism equipment. According to plaintiffs, while public awareness of the potential need for KI was growing, Steven Baker, co-owner and chief executive officer of both ASP and ASI, recognized that there was a market for a child-friendly KI solution that could be used in the event of a nuclear emergency. His research into existing manufacturers of KI products led him to Fleming.[24]

            1.     *The Nondisclosure Agreement*

Baker approached Fleming in April 2003, and the parties met to discuss the possibility of marketing PIMA, or some similar solution, as a child-friendly KI liquid product to be

---

[21] *Id.* ¶ 45 & Ex. 38 (letter from NRC representative with prior correspondence, dated Feb. 15, 2002, included).

[22] *Id.* ¶ 46 & Ex. 38 (letter to Tom Johnson dated Feb. 25, 2002).

[23] *See id.* ¶ 51 & Ex. 5 (Johnson Decl. ¶¶ 11-14); Duthiers Decl Ex. A (Johnson Dep. 86-89); Baker Decl. ¶ 56.

[24] Baker Decl. ¶¶ 3-5.

used in the event of a radiological disaster.[25]

The parties met to discuss this possibility in more depth in May 2003, at which time ASI and Fleming entered into a written nondisclosure agreement that prohibited the disclosure to third parties of any confidential information the parties would share.[26] The agreement expressly excluded protection for information that was (1) available to the public at the date of the disclosure, or thereafter became generally and conveniently available to the public through no breach of the agreement, (2) both known to the receiver prior to the time of disclosure, as evidenced by contemporaneous dated written records, and not acquired from the discloser, or (3) received by independent sources that had the right to disclose the information, without such information having been solicited or obtained by using confidential information protected by the agreement.[27]

---

[25] Def. Rule 56.1 St. ¶ 63; Cpt. ¶ 52. The parties dispute whether they discussed adapting the existing PIMA formula to new uses or inventing a new formula altogether. That is, plaintiffs claim that the parties met to discuss "new product uses of the chemicals in PIMA," Pl. Rule 56.1 St. ¶ 63, rather than "using Fleming's existing liquid KI product" in terrorism survival kits as defendant avers, Def. Rule 56.1 St. ¶ 63. Regardless, ThyroShield, the product Fleming now produces and that plaintiffs claim is their misappropriated idea, is the PIMA formula with a new name. *See id.* ¶ 126. To the extent plaintiffs' allegedly novel idea was to create a new KI formula, it was not misappropriated. Whether the possibility of developing a new formula was discussed is not an issue.

[26] Def. Rule 56.1 St. ¶ 71. The parties quibble over whether ASP also was a party to the nondisclosure agreement and whether any of the information subsequently disclosed to Fleming came from ASI or ASP. As will become clear, the difference is immaterial. Even if, as plaintiffs claim, both ASI and ASP were parties to the contract, there was no breach because none of the information allegedly misappropriated by Fleming was protected under the agreement.

[27] *Id.* Ex. 48 (nondisclosure agreement ¶ 2).

9

### 2. *The Slide Show*

The parties met again on July 18, 2003. Baker made a slide presentation revealing plaintiffs' product idea and business plan.[28] According to the complaint, the "new" product concept was a liquid KI solution in a palatable base sold with graduated pediatric droppers and child-safe caps. The product would be approved by the FDA for over-the-counter sales and used in emergency response to nuclear disasters.[29]

The business plan consisted of information about the risks of terrorist attacks on nuclear power plants in the United States, the superiority of the "new" product concept over existing KI products, and strategies for obtaining FDA approval, marketing and distributing the product, and raising public awareness about the need for KI.[30]

### 3. *The Negotiations*

The parties began negotiating an arrangement whereby Fleming would manufacture a KI product for plaintiffs, who would purchase and market the product.[31] Negotiations soured, however, and Baker began discussions with another pharmaceutical company, Taro Pharmaceutical

---

[28] *Id.* ¶ 79 & Ex. 15 (slide show); Cpt. ¶¶ 62, 64.

[29] Cpt. ¶ 2.

[30] *See* Def. Rule 56.1 St. ¶ 108; Cpt. ¶ 68.

[31] Def. Rule 56.1 St. ¶ 98; Cpt. ¶ 78. The parties dispute how extensive their negotiations after the July 2003 slide show were. *See* Pl. Rule 56.1 St. ¶ 98. The dispute is immaterial. As plaintiffs do not appear to allege that confidential information was exchanged after the slide show, how long or extensively the parties communicated thereafter does not bear on the issue of whether Fleming misappropriated a novel idea belonging to plaintiffs.

Industries, Ltd. ("Taro").[32]

    C.    *Development of ThyroShield*

        1.    *Orphan Drug Status*

The Orphan Drug Act ("ODA"),[33] provides incentives to develop and market drugs for rare diseases, or "orphan drugs." A "rare disease" is one that either affects fewer than 200,000 people in the United States, or "for which there is no reasonable expectation that the cost of developing and making available in the United States a drug for such disease or condition will be recovered from sales in the United States of such drug."[34] Once the FDA approves a drug designated as an orphan drug, it may not approve another drug for treatment of the same disease for a period of seven years.[35]

On June 8, 2004, after the NRC-Anbex contract expired, Fleming applied to the Office of Orphan Products Development for orphan drug designation of its KI product for use as a pediatric thyroid protectant in the event of a radiation emergency. The application was granted on November 17, 2004.[36]

When they learned about Fleming's application for orphan drug status, plaintiffs and

---

[32] Baker Decl. ¶¶ 130, 134-36.

[33] 21 U.S.C. § 360aa *et seq*.

[34] *Id*. § 360bb.

[35] *Id*. § 360cc.

[36] Def. Rule 56.1 St. ¶¶ 120, 123 & Exs. 3 (Love Decl. ¶ 17), 63 (letter from FDA, dated Nov. 17, 2004); Cpt. ¶ 94.

11

Taro stopped negotiations. According to plaintiffs, this was because orphan drug status would prevent manufacturers other than Fleming from entering the U.S. market for oral KI solutions.[37]

### 2. FDA Approval

Fleming filed on July 23, 2004 for FDA approval of a liquid KI solution, which it originally named Famli-GUARD, for use as a thyroid blocking agent in nuclear emergencies.[38] Fleming then changed the name of its product to ThyroShield in order to make it more consistent with previously approved KI product names.[39] On January 12, 2005, the FDA approved Fleming's product,[40] which was the PIMA formula, packaged in the same bottle size that Fleming had been using for many years, without a child-safe cap.[41]

### 3. Government Contract

On March 18, 2005, the Department of Health and Human Services ("HHS") awarded a $5.7 million contract to Fleming for the manufacture and delivery of 1.7 million bottles of

---

[37] Baker Decl. ¶¶ 137-39.

[38] Def. Rule 56.1 St. ¶ 121 & Ex. 61 (letter to FDA, dated July 23, 2004).

[39] *Id.* ¶ 122 & Exs. 3 (Love Decl. ¶ 16), 62 (letter to FDA, dated Nov. 29, 2004).

[40] *Id.* ¶ 125 & Exs. 6 (Patullo Decl. ¶ 10), 65 (letter from FDA, dated Jan. 12, 2005); Cpt. ¶ 96.

[41] *Id.* ¶ 126-27 & Ex. 6 (Patullo Decl. ¶ 11-12).

ThyroShield. The contract did not require the bottles to have child-safe caps and permitted the government to place additional orders at later dates.[42]

In late 2005, HHS asked Fleming to retrofit the 1.7 million bottles with child-safe caps and to include this feature in future orders as well. Fleming agreed to incorporate the caps and the government ordered an additional 3.1 million bottles.[43]

### III.   This Action

The thrust of the complaint is that Baker revealed confidential business strategies that Fleming misappropriated to create and market ThyroShield. The complaint sounds in misappropriation of ideas, unfair competition, accounting, conversion, unjust enrichment, and misappropriation of trade secrets. It alleges also breach of the written nondisclosure agreement.

### *Discussion*

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[44] Where the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence

---

[42] *Id.* ¶¶ 128-29 & Ex. 66 (HHS contract and order form).

[43] *Id.* ¶¶ 129-130 & Exs. 3 (Love Decl. ¶¶ 18-19), 31 (HHS contract and order modification).

[44] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000); *see also* FED. R. CIV. P. 56(c).

to go to the trier of fact on an essential element of the nonmovant's claim.[45] In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.[46]

I.    *Novelty*

Under New York law, "lack of novelty in an idea is fatal to *any* cause of action for its unauthorized use."[47] Moreover, the nondisclosure agreement in this case expressly excluded protection for information already publicly available or known to the recipient. The issue of novelty therefore is central to this case.

To establish novelty, a plaintiff's idea need not reflect a flash of genius, but must show genuine invention and not merely a clever or useful adaptation of existing knowledge.[48] An

---

[45] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Virgin At. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001).

[46] *See, e.g.*, *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123-24 (2d Cir. 2001); *Raskin v. Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir. 1997).

[47] *Kavanau v. Courtroom Television Network*, No. 91 Civ. 7959 (RPP), 1992 WL 197430 *4 (S.D.N.Y. Aug. 3, 1992) (emphasis in original) (quoting *Downey v. Gen. Foods Corp.*, 31 N.Y.2d 56, 61, 286 N.E.2d 257, 259 (1972)).

For property-based claims, such as misappropriation, a plaintiff must show originality, that is, general novelty to the world-at-large. For contract-based claims, a plaintiff need not show originality, but must show novelty to the defendant. *See generally Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368 (2d Cir. 2000) (discussing *Apfel v. Prudential-Bache Secs., Inc.*, 81 N.Y.2d 470, 600 N.Y.S.2d 433 (1993)). In this case, however, the distinction is immaterial. The nondisclosure agreement excluded protection both for information that was not original and for information that was not novel to Fleming.

[48] *AEB & Assocs. Design Group, Inc. v. Tonka Corp.*, 853 F. Supp. 724, 734 (S.D.N.Y. 1994) (internal citations and quotations omitted).

idea that combines several known ideas may be novel, but it is not novel if it "consists of nothing more than a variation on a basic theme."[49] That is, there is a distinction between "novelty of an idea," which is protectible, and "novelty of its execution," which is not.[50] The latter is "only the judicious use of existing means, or the mixture of known ingredients in somewhat different [proportions]."[51] It is not protected because it "partake[s] more of the nature of elaboration and renovation than innovation."[52]

Fleming argues that plaintiffs' claims fail because each element of their proposed product and marketing ideas was not novel.

## II.  Product Concept

The alleged "new" product concept was (1) a liquid KI solution (2) in a palatable base (3) with a graduated pediatric dropper and child-safe cap, (4) to be approved by the FDA for over-the-counter sale and use in emergency response to nuclear disasters.

### A.  *Liquid Solution with Palatable Base*

The idea of a palatable KI liquid product had been well known to Fleming for decades. It had manufactured and sold PIMA, a KI liquid product with a raspberry flavor, since

---

[49] *Id.*

[50] *Victor G. Reiling Assocs. v. Fisher-Price, Inc.*, 450 F. Supp. 2d 175, 180 (D. Conn. 2006) (applying New York law and quoting *Kavanau*, 1992 WL 197430 at *6).

[51] *Id.*

[52] *Id.*

1968.

    B.    *Child-safe Caps and Graduated Droppers*

The idea to use child-safe caps and graduated droppers was not novel either. It is common practice in the pharmaceutical industry to sell products with these features.[53] Moreover, the proper dose of KI for children was public knowledge at least as early as 2001 when the FDA published its guidance document, which discussed the advantages of using KI in nuclear emergencies and recommended dosages.

    C.    *FDA Approval and Emergency Use*

Finally, Fleming knew that PIMA was effective for combating thyroid cancer. It supplied PIMA to victims of the Chernobyl disaster and included information about radiation treatment in its product inserts as early as 1999. Moreover, Fleming knew, as demonstrated by its correspondence with the NRC, that its product easily was administrable to children, that KI might be stockpiled around nuclear power plants, and that FDA approval was required at least to get a contract with the NRC to supply KI for government stockpiles.

III.    *Business Plan*

Plaintiffs' allegedly novel business plan consisted of (1) information about the

---

[53] *See* Def Rule 56.1 St. ¶¶ 105, 107 & Ex 10 (Foltin Dep. 89-93, 118-19). Even if the idea of child-safe caps were novel, Fleming did not misappropriate it from plaintiffs. ThyroShield, as approved by the FDA and originally supplied to HHS, did not include the child-safe caps. It was not until HHS requested the retrofitting of the first 1.7 million bottles and the inclusion of child-safe caps in all future orders that Fleming included them.

potential risk of a terrorist attack on a nuclear power plant in the United States, (2) the need to stockpile liquid KI for counteracting the effects of radiation, (3) the increased market due to the possibility of a terrorist attack, (4) the ease of administering liquid KI solutions, as opposed to solid pills, to children, (5) the need to obtain FDA approval for an over-the-counter liquid KI solution, (6) a strategy for obtaining such approval, (7) a strategy for marketing the liquid KI solution to governments, schools, drug stores, and child care centers, (8) a strategy for distributing the liquid KI product, and (9) a strategy for educating the public about the need for liquid KI.[54]

### A.  Need for Liquid KI Products

Plaintiffs have failed to establish that the information Baker disclosed with respect to the first five elements was novel.

The information about nuclear power plants that plaintiffs disclosed at the slide show consisted of three publicly available maps showing the locations of power plants in the United States.[55]

---

[54] *Id.* ¶ 108; Cpt. ¶ 68.

[55] Def. Rule 56.1 ¶ 95 & St. Ex. 15 (slide show). Plaintiffs claim that these maps were used simply as a springboard for Baker's much more detailed discussion of nuclear power plants in the United States. Pl. Rule 56.1 St. ¶ 95. Baker stated in his declaration that he informed "Fleming about the new reality of terrorism in the United States and the security measures the United States was implementing to protect citizens from terrorist attacks," including passing Project Bioshield, "a $5.6 billion fund intended to encourage the development of drugs, vaccines and other defenses against [terrorist] attacks." Baker Decl. ¶ 102. This does not establish, however, that Baker's information was novel, or that Fleming used it to develop ThyroShield. Information about the laws Congress passes of course is public, and Baker admitted in his deposition that he did not consider the information about Project Bioshield to be confidential, Def. Rule 56.1 St. Ex. 8 (Baker Dep. 70). Moreover, Fleming offered years earlier to produce PIMA for government stockpiles of KI near nuclear power plants, thus showing that it knew of the "security measures the United States was implementing to protect its citizens."

Second, the need to stockpile KI products near nuclear power plant sites already was known to Fleming, as demonstrated by its offers to the NRC in 1998 and 2002 to be considered as a supplier of KI for government stockpiles.

Third, the increased market due to rising concerns about terrorist attacks was public knowledge. After September 11, 2001, numerous politicians and news commentators called on the U.S. government to improve preparedness for nuclear disasters and stockpile KI.

Fourth, the FDA had announced publicly the superiority of liquid-form KI in its guidance document outlining procedures for administering KI to children. In that document the FDA specifically recommended dissolving KI pills in liquid.

And fifth, the need to obtain FDA approval, at least to get a contract with the NRC, already was known to Fleming from its 2002 correspondence with the NRC, in which it was told Anbex's KI product had been selected for government stockpiles because it had FDA approval.

> B.    *Marketing Strategies*

Plaintiffs have failed to produce evidence showing that the remaining elements of their business plan, their marketing and regulatory strategies, were more intricate or original than the basic, common sense steps any seller would take to market a drug, or steps that already had been recommended publicly for the distribution of KI products.

The idea of providing governments, schools, drug stores, and child care centers with KI products was touted publicly after the events of September 11, 2001. It was not novel.

The evidence shows that plaintiffs' strategy for obtaining FDA approval involved

only calling the FDA and asking it for guidance about how to proceed,[56] that their distribution strategy consisted of gaining exclusive rights to a product and then distributing it to major drug stores like CVS,[57] and that their strategy for alerting the public was to "create awareness" and "contact key players."[58] These strategies are too obvious to be called novel.[59]

Plaintiffs deny that their regulatory and marketing strategies were this simple, and assert that Baker revealed much more detailed plans during the slide show presentation.[60] They fail, however, to point to admissible evidence to support these assertions.[61]

C.  *Additional Information*

Plaintiffs contend that the slides alone do not reveal all of the information Baker disclosed. To support this, they offer Baker's preparatory notes for the July 18, 2003 slide show and his notes memorializing his meeting the night before with Ted Feller, a Fleming representative.[62]

To the extent the notes are decipherable, nothing in them aids plaintiffs' case. The

---

[56] *Id.* ¶ 112 & Ex. 9 (Fenton Dep. 182-83).

[57] *Id.* ¶ 96 & Ex. 15 (slide show).

[58] *Id.* ¶ 93 & Ex. 15 (slide show).

[59] Indeed, Fleming already had employed the distribution strategy of selling products to major drug store chains like CVS. *Id.* ¶ 60 & Ex. 5 (Johnson Decl. ¶ 4).

[60] Pl. Rule 56.1 St. ¶¶ 96, 112.

[61] *See id.*

[62] *See* Baker Decl. Ex. 25.

19

notes, along with Baker's deposition testimony, show only that Baker conducted extensive market research, interviewed customers, and confirmed that there was public desire for a child-friendly liquid KI product. While he revealed certain pieces of information to Fleming that may have been confidential, such as names of high-profile customers Baker interviewed, research methods, names of the members of Baker's research team, and one brand name Baker considered for his product,[63] the evidence does not show that Fleming relied in any way on this information in deciding to sell its existing KI product to the government, which it had been trying to do at least since 2002.

IV.     *Combination of Non-novel Ideas*

Plaintiffs argue that even if the constituent elements of its product concept and business plan were not novel, the entire package, taken as whole, was original. This is demonstrated, they claim, by the fact no product like ThyroShield existed when the parties first met.

This argument is unconvincing. The need for KI liquid solution was well known in 2003. Fleming had been making just such a product for over thirty years and had labeled it as a radiation protectant at least since 1999. ThyroShield simply was PIMA in a new bottle and marketed with a different purpose. It was a not a novel product, but rather a useful adaptation of an existing one. In other words, it partook "more of the nature of elaboration and renovation than innovation."[64]

This is not to say that Fleming necessarily received no benefit from meeting with plaintiffs. Perhaps it gained from learning that Baker's research confirmed the existence of a liquid KI market. And it likely benefitted from learning that other companies were moving to tap that

---

[63] *See* Def. Rule 56.1 St. Ex. 8 (Baker Dep. 117-129, 160-61, 168, 169).

[64] *Victor G. Reiling Assocs.*, 450 F. Supp. 2d at 180.

market. This, however, does not create any issue for trial. Fleming was prohibited from misappropriating novel ideas, not from being spurred to develop a product it long had contemplated making.

*Conclusion*

Defendant's motion for summary judgment dismissing the complaint is granted. Plaintiffs' motion for a preliminary injunction is denied.

SO ORDERED.

Dated:  January 26, 2007

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)